UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

        v.

WILLIE J. WOFFORD,

                     Defendant.

_____

<u>REPORT & RECOMMENDATION</u>

19-CR-6061EAW

## **<u>PRELIMINARY STATEMENT</u>**

By Order of Hon. Elizabeth A. Wolford, United States District Judge, dated April 25, 2019, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 28).

On April 25, 2019, the grand jury returned a five-count indictment against Willie J. Wofford.  (Docket # 26).  Counts One, Two, Three and Five charge Wofford with possession of marijuana or cocaine with intent to distribute it on various dates between September 11, 2017 and July 25, 2018, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and 841(b)(1)(C).  (*Id.*).  Count Four charges Wofford with possession of firearms on February 20, 2018 in furtherance of the drug trafficking crimes charged in Counts Two and Three, in violation of 18 U.S.C. § 924(c)(1)(A).  (*Id.*).  Currently pending before this Court for report and recommendation are Wofford's motions to suppress statements and tangible evidence.[1]  (Docket # 37).  For the

---

[1]  Wofford filed several omnibus motions seeking other forms of relief, including a bill of particulars, *Brady* material, discovery, Rule 404(b), 608 and 609 materials, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 37).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on August 6, 2019.  (Docket ## 41, 42).

reasons discussed below, I recommend that the district court grant in part and deny in part the motion to suppress statements and deny the motion to suppress tangible evidence.

## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing over the course of five days between December 2019 and August 2020 concerning the circumstances surrounding two traffic stops of a vehicle occupied by Wofford.[2]  (Docket ## 50, 51, 54, 58, 64).  During the hearing, the government offered testimony from Rochester Police Department ("RPD") Officer Sino Seng ("Seng"), RPD Investigator John Muller ("Muller"), RPD Sergeant Joseph Perrone ("Perrone"), RPD Officer Jennifer Grillo ("Grillo"), RPD Officer Taurean Cumberbatch ("Cumberbatch"), RPD Officer Benjamin Wilburn ("Wilburn"), and RPD Officer Jason Hess ("Hess"), and the defense offered testimony from William Shields ("Shields"), Ph.D.  (Tr. A 5, 107; Tr. B 26, 55-56, 85-86; Tr. C 11, 54; Tr. E 2).  Video footage from a street camera and body cameras worn by Seng, Grillo, Cumberbatch, Wilburn, and Hess, was also introduced into evidence and reviewed by the Court.  (Government's Exhibits ("G. Exs.") 2, 40, 41, 41A; Defendant's Exhibit ("D. Ex.") L).

A.    **February 20, 2018 Traffic Stop**

1.    **Seng's Testimony and Body Camera Footage**

At the time of his testimony Officer Seng had been employed by the RPD for approximately six years.  (Tr. A 5).  Seng was on duty on February 20, 2018 between 3 p.m. and 11:15 p.m.  (Tr. A 7-8, 66).  Following roll call that day, Investigator Muller informed Seng and

---

[2] The transcript of the December 13, 2019 hearing shall be referred to as "Tr. A __," the transcript of the December 17, 2019 hearing shall be referred to as "Tr. B __," the transcript of the January 29, 2020 hearing shall be referred to as "Tr. C __," the transcript of the March 2, 2020 hearing shall be referred to as "Tr. D __," and the transcript of the August 12, 2020 hearing shall be referred to as "Tr. E __."  (Docket ## 53, 59, 61, 62, 65).

other officers that he had learned that Wofford had been conducting drug sales out of a 2011 Traverse, which Wofford typically parked in the area of 67 York Street during the sales. (Tr. A 8-9).

During patrol that day, Seng observed the 2011 Traverse parked on the east side of York Street near the intersection with Danforth Street. (Tr. A 9-10). Seng notified Muller and other officers that he had observed the vehicle, and they decided to commence surveillance. (Tr. A 9-10). Seng parked his vehicle in a parking lot at the corner of West Avenue and York Street, in a location from which he could observe the rear of the Traverse. (Tr. A 10-11, 78; G. Ex. 1). According to Seng, from his vantage point he could observe only the rear of the vehicle because his view was obstructed by a fence. (Tr. A 11; G. Ex. 1). After Muller arrived on scene, Seng relocated his vehicle to the intersection of Danforth and Child Streets. (Tr. A 13-14; G. Ex. 1). Seng was unable to see the Traverse but was in a position to intercept it if it traveled north on York Street. (Tr. A 14-15).

Shortly thereafter, Muller informed Seng that the Traverse had begun to travel north on York Street. (Tr. A 16). Seng traveled to the intersection of Delano Street and Child Street in order to continue surveillance of the Traverse as it moved. (Tr. A 16; G. Ex. 1). Seng observed the Traverse at a stop sign at the intersection of Delano and Child Streets. (Tr. A 17; G. Exs. 1, 2). The Traverse made a left-hand turn onto Child Street, and Seng immediately conducted a U-turn in order to follow the vehicle. (Tr. A 17; G. Ex. 2).

Seng testified that he was able to see the Traverse in his side-view mirror during the maneuver, and he observed the vehicle approach the stop sign at the intersection of Child and Danforth. (Tr. A 17, 22, 71, 75; G. Ex. 2). According to Seng, the driver of the Traverse did not signal a turn as it approached the stop sign. (Tr. A 18, 72). Rather, the driver engaged the turn

3

signal only when the Traverse was within approximately one vehicle-length of the stop sign. (Tr. A 22, 24, 72; G. Ex. 2). Seng testified that failure to signal at least 100 feet before conducting a turn constitutes a violation of N.Y. Vehicle and Traffic Law Section 1163(b). (Tr. A 18, 22-23). The Traverse turned left onto Danforth Street, and Seng continued to follow it as it turned right onto York Street. (Tr. A 25; G. Exs. 1-2).

At that point, Seng activated his emergency equipment and initiated a traffic stop in the area of 27 York Street. (Tr. A 26). The Traverse immediately pulled over, and Seng exited his patrol vehicle and approached the driver's side door. (Tr. A 26-27; G. Ex. 40 Seng Footage Video 1 at 17:35:09). He asked the driver for his license and the vehicle's registration and learned that Wofford was the driver of the vehicle. (Tr. A 27; G. Ex. 40 Seng Footage Video 1 at 17:35:16). According to Seng, Wofford rolled the window down only a few inches, just enough to pass the documents to him, leading him to believe that Wofford was trying to prevent him from discovering something inside the Traverse. (Tr. A 28, 81; G. Ex. 40 Seng Footage Video 1 at 17:35:15).

As he was conversing with Wofford, Seng smelled the odor of marijuana emanating from the Traverse; at the hearing, Seng testified that he could not recall whether he smelled burnt or unburnt marijuana, which have distinct odors. (Tr. A 28-30, 70, 81-82). Seng also testified that he was unable to deduce the quantity of marijuana based upon its odor. (Tr. A 88). As a law enforcement officer, Seng had received training relating to the smell of marijuana and had conducted approximately 100 traffic stops involving the smell of marijuana. (Tr. A 29, 85). According to Seng, in 2018 it was unlawful to possess any quantity of marijuana. (Tr. A 88).

Seng asked Wofford whether he had "been smoking earlier," and Wofford responded in the negative. (Tr. A 30, 70; G. Ex. 40 Seng Footage Video 1 at 17:35:21 – 17:35:24). Seng commented that there was "a strong odor of marijuana coming from [the] car." (G. Ex. 40 Seng Footage Video 1 at 17:35:26). As Seng walked back towards his patrol vehicle, he commented to another officer who had arrived on scene that "there was a strong odor of marijuana" coming from the Traverse. (G. Ex. 40 Seng Footage Video 1 at 17:35:36 – 17:35:42). According to Seng, the other officers at the scene included Cumberbatch, Grillo and Muller. (Tr. A 78).

Seng ran Wofford's license and determined that he did not have any outstanding warrants. (Tr. A 35-36; G. Ex. 40 Seng Footage Video 1 at 17:35:50 – 17:36:31). Muller arrived at the scene, and the officers asked Wofford to step out of the vehicle; Wofford refused. (Tr. A 36; G. Ex. 40 Seng Footage Video 2 at 17:38:56). At that point, Seng called Sergeant Perrone and asked him to respond to the scene because permission from a sergeant was required before officers could break a window in order to remove an individual from a vehicle. (Tr. A 36; G. Ex. 40 Seng Footage Video 2 at 17:39:20 – 17:39:51).

Perrone and Lieutenant Montinarelli arrived at the scene and spoke to Wofford at the driver's side window. (Tr. A 37; G. Ex. 40 Seng Footage Video 3 at 17:49:42, 17:54:14). Seng moved to the passenger side of the vehicle and peered through the front and rear passenger windows using his flashlight. (Tr. A 37-38, 72; G. Ex. 40 Seng Footage Video 3 at 17:49:42 – 17:50:33, 17:52:43). Seng testified that he observed an open container of alcohol and a plastic bag, but he was unable to see what was in the bag. (Tr. A 37-39, 73). Meanwhile, Montinarelli informed Wofford that the traffic stop was being conducted because he had failed to signal when he pulled away from the curb. (G. Ex. 40 Seng Footage Video 3 at 17:53:51 – 17:53:53).

5

Wofford persisted in his refusal to exit the vehicle, and eventually Perrone and Montinarelli authorized the officers to access the interior of the vehicle by breaking a window. (Tr. A 39-40; G. Ex. 40 Seng Footage Video 3 at 17:57:15). After the officers started striking the vehicle, but before any windows were broken, Wofford exited the vehicle. (Tr. A 40-42; G. Ex. 40 Seng Footage Video 3 at 17:58:15).

Seng helped to handcuff and search Wofford and then placed him in the back of Seng's patrol car. (Tr. A 42-43, 45; G. Ex. 40 Seng Footage Video 3 at 17:59:19 – 17:59:32). According to Seng, Wofford was being detained pending an investigation but was not under arrest at this point, and Seng did not advise Wofford of his *Miranda* rights. (Tr. A 43-44, 92). Seng learned from other officers that a handgun and narcotics were located during a search of the Traverse. (Tr. A 43, 45). Seng transported Wofford to the Public Safety Building and escorted him to an interview room. (Tr. A 45). Wofford was thereafter charged and transported to the Monroe County Jail. (Tr. A 46). Seng also issued him a traffic citation for failure to signal in violation of Section 1163(b). (Tr. A 23, 68, 71). According to Seng, he issued the traffic citation prior to reviewing street camera footage capturing the infraction. (Tr. A 68-69).

### 2. **Muller's Testimony**

Muller testified that he had recently retired from the RPD after a twenty-five-year career, the last sixteen years of which he had worked as an investigator. (Tr. A 108). In September 2017, Investigator Muller participated in an investigation into a complaint by Wofford that he had been the victim of a robbery in which his car had been stolen. (Tr. A 143). A suspect in the crime, Jimmy Ball, informed Muller that he had robbed Wofford and had found marijuana in Wofford's vehicle. (Tr. A 147). Ball was suspected of committing several other crimes, including thefts from vehicles and armed robbery. (Tr. A 144-45). Muller had also

received information from another officer leading him to suspect that Wofford's stolen vehicle contained narcotics. (Tr. A 147).

After roll call on February 20, 2018, Muller advised Seng that he suspected that Wofford was selling narcotics out of a black Traverse in the area of York Street. (Tr. A 111, 147-48). Later during the same shift, Muller received a phone call from Seng informing him that Seng had spotted the black Chevy Traverse on York Street. (Tr. A 111, 148). Muller drove his vehicle to that area and parked it in a nearby parking lot in the area of York Street and West Main Street. (Tr. A 111-12, 148-49; G. Ex. 1). He parked near the street so that he had a view of York Street. (Tr. A 112-13). Using binoculars, Muller was able to observe the Traverse, although he was unable to read its license plate. (Tr. A 113, 151).

At approximately 5:25 p.m., Muller observed a person he believed to be Wofford get into the driver's seat of the Traverse. (Tr. A 114, 151). Muller testified that he recognized Wofford based upon his build, movements, and general appearance. (Tr. A 114). Approximately five minutes later, Muller observed a black Toyota SUV park directly behind the Traverse. (Tr. A 115, 151-52). The driver of the Toyota SUV got out and approached the driver's window of the Traverse. (Tr. A 115, 152-53; Tr. B 8). The driver appeared to converse with Wofford and then reach into his pocket and reach his hand into the driver's side window of the Traverse. (Tr. A 115, 152-53; Tr. B 8). According to Muller, the individual then put his hand back into his pocket and returned to the Toyota SUV. (Tr. A 116, 152-53).

While the individual from the Toyota SUV was still standing at the Traverse, a green Toyota sedan parked directly behind the SUV. (Tr. A 116). Two individuals exited the sedan and approached the passenger window of the Traverse, and the individual from the SUV returned to his vehicle. (Tr. A 116, 153). The individuals from the sedan reached into their

pockets, reached into the passenger side door of the Traverse, returned their hands to their

pockets, and then returned to the Toyota sedan.  (Tr. A 116-17, 154).  Although Muller was

unable to see anything in their hands, he suspected that he was witnessing drug sales.  (Tr. A

117).

Shortly thereafter, all of the vehicles pulled away from the curb.  (Tr. A 118).

Muller initially believed that Wofford had not signaled prior to driving the Traverse from the

curb.  (Tr. A 118).  Muller later reviewed surveillance video of the area and determined that

Wofford had signaled.  (Tr. A 119).  Muller did not follow the Traverse.  (Tr. A 119).

Muller received a phone call from Seng informing him that Seng had conducted a

traffic stop of the Traverse, the vehicle smelled of marijuana, and Wofford had refused to exit the

vehicle.  (Tr. A 119, 156, 159).  Muller went to 27 York Street, the scene of the stop.  (Tr. A 120;

Tr. B 8).  Muller approached Wofford, who was still in the Traverse, and explained to him that

he could smell the odor of marijuana coming from the vehicle.  (Tr. A 120, 157).  Muller

testified that he had received training on the smell of both burnt and unburnt marijuana and had

been involved in hundreds of investigations involving marijuana.  (Tr. A 120-21).  According to

Muller, burnt and unburnt marijuana have distinct smells, and he immediately detected the odor

of unburnt, dried marijuana emanating from the interior of the vehicle as he approached it.

(Tr. A 121, 157-58; Tr. B 9).

Muller instructed Wofford to step out of the vehicle, but Wofford refused.  (Tr. A

122).  During their interaction, Wofford asked for an attorney and asked whether he could leave.

(Tr. A 159; Tr. B 9).  Muller told Wofford he was not able to leave, but was free to call his

attorney or have Muller call the attorney if Wofford supplied the phone number.  (Tr. A 159;

Tr. B 9, 23-24).  Muller observed Wofford use his phone to make a call, but he never learned

whom he called or what, if anything, was discussed.  (Tr. B 24-25).  Muller also recalled that someone advised Wofford that he had been stopped because he had failed to signal before turning.  (Tr. A 160-61).

As he was talking to Wofford, Muller used his flashlight to peer through the rear driver's side window into the back seat of the vehicle.  (Tr. A 122; Tr. B 10).  Muller observed a black garbage bag on the floor of the vehicle.  (Tr. A 122-23, 126, 161; Tr. B 9).  Muller testified that the bag was open and he observed a blue-tinted freezer bag containing a brown-green leafy substance that he believed was marijuana.  (Tr. A 123, 162).  Muller estimated the freezer bag to be gallon-sized and almost full and saw that it appeared to contain both loose marijuana and smaller Ziploc bags of marijuana.  (Tr. A 123).  According to Muller, he believed that the quantity of marijuana he observed was large enough to support a misdemeanor charge of criminal possession, at the very least.  (Tr. B 21).

When Perrone and Montinarelli arrived on scene, Muller shared his observations with them and then stepped away in order to permit them to converse with Wofford.  (Tr. A 124).  Although authorization to break the windows of the vehicle was eventually provided, Wofford exited the Traverse before any of its windows were broken.  (Tr. A 125).  Muller ordered Wofford to place his hands behind his back and held his hands there while another officer handcuffed him.  (Tr. A 125).

After Wofford had been placed into the back of a patrol car, Muller opened the Traverse's driver's side rear door and picked up the garbage bag that he suspected contained marijuana.  (Tr. A 125).  Muller then placed the bag into a child's booster seat on the back seat of the vehicle.  (Tr. A 126-28, G. Exs. 5, 6).  Perrone also drew Muller's attention to a handgun and suspected cocaine in the center console between the front seats.  (Tr. A 129).

9

### 3.     Grillo's Testimony and Body Camera Footage

Grillo testified that she had been employed as an officer for the RPD for approximately three-and-one-half years.  (Tr. B 56).  On February 20, 2018, Officer Grillo responded to 27 York Street to assist Seng with the traffic stop of the Traverse.  (Tr. B 58-59).  She approached the rear of the Traverse and stationed herself near the rear passenger side corner of the vehicle.  (Tr. B 59, 76; G. Ex. 40 Grillo Footage Video 2 at 17:35:13 – 17:36:39).[3]  Officer Cumberbatch had also responded to the scene and was stationed near the front passenger side window.  (Tr. B 59).  Grillo stayed near the rear of the vehicle until Seng returned to his patrol car, at which point she moved towards the driver's side window.  (Tr. B 59; G. Ex. 40 Grillo Footage Video 2 at 17:36:39 – 17:37:03).  She was unable to recall whether she smelled the odor of marijuana while she was standing on the passenger side of the vehicle, but testified that she smelled the odor of marijuana as she approached the driver's window, although she was not certain whether the scent was one of burnt or unburnt marijuana.  (Tr. B 60, 77, 79).

Grillo observed a single occupant in the Traverse and asked him to place his vehicle in park.  (Tr. B 60-61; G. Ex. 40 Grillo Footage Video 2 at 17:37:34 – 17:37:39).  She also noticed an unsealed bottle of alcohol in the back seat.  (Tr. B 79-80).  Grillo noted that the rear windows of the vehicle were tinted and asked Cumberbatch whether he had a tint reader.  (Tr. B 66, 76, 84; G. Ex. 40 Grillo Footage Video 2 at 17:38:36).  According to Grillo, she attempted to peer into the tinted rear windows using her flashlight but was unable to recall seeing any contents from her position outside of the vehicle.  (Tr. B 84-85).

While Grillo was on the driver's side of the car, Muller approached and attempted to convince Wofford to leave the vehicle.  (G. Ex. 40 Grillo Footage Video 2 at 17:38:46 –

---

[3] The first video file of Grillo's body camera footage contained in Government's Exhibit 40 is unrelated to this traffic stop.  (Tr. B 63).

17:49:24).  Muller directed Wofford to step out of the vehicle.  (G. Ex. 40 Grillo Footage Video

2 at 17:38:58).  When Wofford refused, Muller told Wofford that he could smell marijuana

coming from the Traverse and that he was "going to take [the] window out," and he drew his

baton.  (G. Ex. 40 Grillo Footage Video 2 at 17:39:08 – 17:39:11).  Muller also informed

Wofford that he had been watching him and that he knew Wofford sold marijuana.  (G. Ex. 40

Grillo Footage Video 2 at 17:39:11 – 17:39:35).  Wofford refused repeated demands that he exit

the vehicle and told Muller to obtain a warrant for the vehicle.  (G. Ex. 40 Grillo Footage Video

2 at 17:39:35 – 17:39:44).  Muller told Wofford that he was being detained and did not have

permission to leave and that "this is not just going to go away."  (G. Ex. 40 Grillo Footage Video

2 at 17:39:48 – 17:40:08).  Muller also commented that Wofford had "been selling out here for a

long time."  (G. Ex. 40 Grillo Footage Video 2 at 17:41:34 – 17:41:37).  After peering into the

back of the vehicle with a flashlight, Muller told Wofford that he knew Wofford had weed in the

car.  (G. Ex. 40 Grillo Footage Video 2 at 17:41:35 – 17:41:58).  When Wofford again refused to

get out of the vehicle, Muller informed him that a sergeant was coming to the scene.  (G. Ex. 40

Grillo Footage Video 2 at 17:42:36).  After Wofford said he had done nothing wrong, Muller

stated, "We both know what you've been doing" and "I'm not leaving you here."  (G. Ex. 40

Grillo Footage Video 2 at 17:43:30 – 17:43:36).

            Muller continued to try to persuade Wofford to exit the vehicle, and Wofford

mentioned his attorney.  (G. Ex. 40 Grillo Footage Video 2 at 17:44:14).  Muller offered to speak

to Wofford's attorney, and Wofford responded that he did not "want to talk."  (G. Ex. 40 Grillo

Footage Video 2 at 17:44:14 – 17:44:26).  Muller then asked Wofford what he "had to hide" and

whether the reason he was "down here was the same reason [he] got robbed."  (G. Ex. 40 Grillo

Footage Video 2 at 17:44:53 – 17:46:03).  At one point, Wofford stated that he did not have to speak with Muller.  (G. Ex. 40 Grillo Footage Video 2 at 17:45:20).

In response to a comment by Wofford, Muller said, "I didn't say you were *smoking* weed," and told Wofford that he could smell the odor of marijuana "pouring out" of the vehicle.  (Tr. B 79; G. Ex. 40 Grillo Footage Video 2 at 17:47:21 – 17:47:38).  Grillo reported to Muller that Wofford had failed to signal when pulling from the curb, and Muller responded that Wofford also had not signaled when making the left turn.  (G. Ex. 40 Grillo Footage Video 2 at 17:47:26 – 17:47:32).  After further conversation with Wofford, Muller intimated that he had been watching Wofford for some time, asking, "Do you really think that this suddenly happened, poof out of thin air; you don't think I haven't been making observations?"  (G. Ex. 40 Grillo Footage Video 2 at 17:48:11 – 17:48:25).

Approximately fifteen minutes after Wofford had been stopped, Perrone arrived and began speaking to Wofford.  (G. Ex. 40 Grillo Footage Video 2 at 17:49:17 – 17:49:30).  Perrone informed Wofford that he could smell the odor of marijuana coming from the vehicle and that Wofford had been stopped for the tint on his windows.  (G. Ex. 40 Grillo Footage Video 2 at 17:49:45 – 17:50:05).

Montinarelli arrived and also spoke with Wofford in an attempt to convince him to exit the vehicle.  (G. Ex. 40 Grillo Footage Video 2 at 17:53:43).  In response to Wofford's questions concerning the basis for the stop, Montinarelli stated that Wofford had been pulled over after failing to signal from the curb.  (G. Ex. 40 Grillo Footage Video 2 at 17:53:50 – 17:53:58; G. Ex. 40 Cumberbatch Footage Video 1 at 17:53:43 – 17:53:51).  Wofford responded that one of the officers had said that he had been "smoking weed," to which Montinarelli and Perrone responded that an odor of marijuana was coming from the vehicle.  (G. Ex. 40 Grillo

12

Footage Video 2 at 17:53:59 – 17:54:04; G. Ex. 40 Cumberbatch Footage Video 1 at 17:53:51 –

17:53:58).  As Wofford continued to argue with them concerning the basis for the stop,

Montinarelli responded, "If you've done nothing and have nothing in your car," there should be

no reason not to exit the vehicle.  (G. Ex. 40 Grillo Footage Video 2 at 17:54:46 – 17:54:50;

G. Ex. 40 Cumberbatch Footage Video 1 at 17:54:38 – 17:54:44).  Montinarelli also told

Wofford that there was a "distinct" odor of marijuana emanating from the vehicle and that none

of the officers had said that the odor was of "burned" marijuana.  (Tr. B 81; G. Ex. 40 Grillo

Footage Video 3 at 17:57:04 – 17:57:11).  Wofford disagreed, stating that the officers were

unable to smell anything, to which Montinarelli replied, "I can smell it right now."  (G. Ex. 40

Grillo Footage Video 3 at 17:57:12 – 17:57:16).  A few minutes after Montinarelli arrived, the

officers began attempting to break the windows of the Traverse.  (G. Ex. 40 Grillo Footage

Video 3 at 17:57:22).  Shortly thereafter, Wofford exited the vehicle.  (G. Ex. 40 Grillo Footage

Video 3 at 17:58:13).

After Wofford exited the vehicle, Grillo placed him in handcuffs and assisted in

searching the vehicle, beginning near the front passenger door.  (Tr. B 68; G. Ex. 40 Grillo

Footage Video 3 at 17:58:22 – 17:59:04).  While she was searching that area, Perrone stated that

he had found marijuana, crack cocaine, and a gun.  (Tr. B. 68-69; G. Ex. 40 Grillo Footage

Video 3 at 17:59:23 – 17:59:26, 18:00:03).  Grillo testified that she observed those items in the

center console area of the vehicle.  (Tr. B 69).  After searching the front passenger area, Grillo

began searching the area around the rear passenger seat.  (Tr. B 70; G. Ex. 40 Grillo Footage

Video 3 at 18:01:10).  Grillo observed the unsealed bottle of alcohol and a plastic shopping bag

that contained multiple baggies filled with suspected marijuana.  (Tr. B 70-71, 73; G. Exs. 7-12,

40 Grillo Footage Video 3 at 18:01:10 – 18:01:27).  Grillo also searched the trunk area of the

Traverse, but did not locate anything of evidentiary value.  (Tr. B 74).

### 4.    Perrone's Testimony

Perrone testified that he had been employed in law enforcement for approximately

twenty years and had been a sergeant with RPD for the previous four years.  (Tr. B 26-27).  On

February 20, 2018, Sergeant Perrone received a phone call from Seng requesting his assistance

with a traffic stop involving a driver who was refusing directives to exit the vehicle.  (Tr. B

28-29, 43).  At the scene, Perrone spoke with Seng and Muller, and he then approached the

vehicle and requested that Wofford exit the vehicle.  (Tr. B 28-29).

Perrone testified that he did not smell marijuana when he initially arrived on

scene, but he did smell a strong odor of marijuana when he approached the Traverse to speak to

Wofford.  (Tr. B 31-32, 55).  Perrone stated that it was obvious to him that the odor was coming

from the Traverse, although he was unable to recall whether the odor was of burnt or unburnt

marijuana.  (Tr. B 32, 44).  According to Perrone, he had been trained regarding the detection of

the scents of both burnt and unburnt marijuana and had encountered marijuana more than one

thousand times in his work as a law enforcement officer.  (Tr. B 31-32, 45).  Perrone also

testified that Muller reported that he had observed marijuana in plain view inside the Traverse.

(Tr. B 46).

Perrone testified that after the officers unsuccessfully attempted to break one of

the windows Wofford exited the car and was taken into custody.  (Tr. B 33).  Perrone then

assisted with a search of the Traverse's interior, beginning with the area around the driver's seat

and the center console.  (Tr. B 33-34, 48-50).  According to Perrone, he discovered a handgun,

suspected cocaine, and suspected marijuana in the compartments of the center console.  (Tr. B

34-39; G. Exs. 13-16). After completing the search of the vehicle, Perrone determined that the vehicle should be towed in accordance with RPD General Order 511. (Tr. B 39-43; G. Ex. 18). Perrone acknowledged that Wofford's wife had arrived on scene and had asked to drive the Traverse home before he directed that the Traverse be towed. (Tr. B 52).

### 5.    **Cumberbatch's Testimony**[4]

Cumberbatch testified that he had been employed as an RPD officer for approximately six years. (Tr. B 86). On February 20, 2018, he responded to York Street to assist Seng with a traffic stop. (Tr. B 87-88, 109). According to Officer Cumberbatch, he had received a message from Seng prior to the stop indicating that Seng and Muller were conducting surveillance on a vehicle and might need assistance conducting a stop. (Tr. B 109).

Cumberbatch arrived at the scene of the stop immediately after Seng, exited his vehicle, and approached the front passenger side door of the vehicle while Seng approached the driver's door. (Tr. B 88). Cumberbatch testified that from his position next to the passenger side door he could smell the odor of unburnt marijuana coming from the vehicle. (Tr. B 92-93, 108). Using a flashlight, Cumberbatch peered into the front and rear passenger side windows of the vehicle, observed a bottle of alcohol and several plastic bags, but did not observe any contraband. (Tr. B 104-108).

Cumberbatch testified that Muller and Perrone attempted to convince Wofford to exit the vehicle and, when their efforts failed, officers attempted to break the vehicle's windows to gain access to the interior. (Tr. B 91-92). When Wofford exited the vehicle, Cumberbatch assisted in handcuffing him and then participated in the search of the vehicle. (Tr. B 90, 92-93).

---

[4] Cumberbatch also wore a body camera during the February 20, 2018 traffic stop, footage of which is contained on Government's Exhibits 40 and 41. The footage is largely duplicative of the footage captured by Seng's and Grillo's body cameras and is cited herein only where relevant.

Cumberbatch entered the front driver's side door of the vehicle and removed two cell phones and $186 in cash.  (Tr. B 93-96; G. Exs. 13, 17).

After the search of the Traverse, Cumberbatch completed a tow report identifying the items taken from the vehicle.  (Tr. B 96-97; G. Ex. 19).  According to Cumberbatch, RPD General Orders required that the vehicle be towed because it had been involved in a felony drug arrest.  (Tr. B 96).  Cumberbatch performed field tests on the drugs seized from the Traverse, which were positive for cocaine and marijuana.  (Tr. B 103).

### 6.    <u>Wofford's Affidavit</u>

Wofford submitted an affidavit concerning the circumstances of the February 20, 2018 traffic stop.  (Docket # 37-1 at 8-11).  Wofford states that on February 20, 2018, he was driving the Traverse, which was owned by his wife, and was informed that he was being stopped for a traffic infraction.  (*Id.* at ¶¶ 4, 6).  During the stop, Seng informed Wofford that he smelled marijuana and asked him whether he had been smoking earlier.  (*Id.* at ¶ 7).  According to Wofford, he had not been smoking marijuana and did not smell an odor of marijuana.  (*Id.* at ¶ 8).  When directed to exit the vehicle, Wofford refused to do so without a warrant.  (*Id.* at ¶ 9).  Wofford stated that he was told that he was not free to leave.  (*Id.*).  According to Wofford, the officers threatened to break his windows if he refused to exit the vehicle, and he told them to call his attorney.  (*Id.* at ¶ 10).

Wofford states that when the officers started striking the Traverse he exited the vehicle to prevent any further violence.  (*Id.* at ¶ 11).  After exiting his vehicle, the officers immediately entered the Traverse and began searching it without Wofford's consent.  (*Id.* at ¶ 12).  Wofford was handcuffed and placed into the back of a patrol car.  (*Id.* at ¶ 15).  Wofford states that he was not provided *Miranda* warnings before making statements.  (*Id.* at ¶ 16).

16

According to Wofford, he was never informed at the scene that he had failed to signal within 100 feet of a turn, and he does not believe that he committed a traffic infraction.  (*Id.* at ¶ 14).  Wofford states that he came to a stop at the intersection of Child Street and Danforth Street before making a turn.  (*Id.*).

      **B.**    **July 25, 2018 Traffic Stop**

          **1.**    **Seng's Testimony and Body Camera Footage**

On July 25, 2018, Seng was involved in another traffic stop involving Wofford. (Tr. A 46).  Prior to that day, Bureau of Alcohol, Tobacco, and Firearms Agent Ryan Szwejbka ("Szwejbka") had advised Seng that there was a federal arrest warrant outstanding for Wofford, Seng had advised Muller of the warrant, and Muller had confirmed the existence of the warrant. (Tr. A 46-47).

Seng was patrolling eastbound on West Avenue on July 25 when he observed Wofford driving the Traverse westbound on West Main Street in the direction of West Avenue. (Tr. A 47-48).  Wofford passed Seng, who immediately conducted a U-turn and followed Wofford's vehicle.  (Tr. A 48).  Seng followed the vehicle from West Avenue onto Glide Street, where he made the traffic stop.  (Tr. A 49; G. Ex. 41 Seng Footage Video 1).

Seng exited his patrol vehicle, approached the driver's side of the Traverse, asked Wofford for his identification, and ordered Wofford to exit the vehicle.  (Tr. A 50, 53; G. Ex. 41 Seng Footage Video 1 at 18:12:54 – 18:13:16).  As Seng was conversing with Wofford, Wilburn arrived at the scene and approached the passenger side door of the Traverse.  (G. Ex. 41 Seng Footage Video 1 at 18:13:19).  After Seng several times ordered Wofford to exit and drew his taser, Wofford exited the vehicle, and Seng handcuffed him.  (Tr. A 53-54, 94; G. Ex. 41 Seng Footage Video 1 at 18:13:16 – 18:14:21).  During these interactions, Wofford asked to call his

attorney and his wife.  (Tr. A 53-54, 94; G. Ex. 41 Seng Footage Video at 18:13:31 – 18:13:47,

18:15:26 – 18:15:35).  Seng advised Wofford that there was a federal warrant for his arrest.

(Tr. A 54; G. Ex. 41 Seng Footage Video 1 at 18:14:24 – 18:14:50).  He conducted a pat frisk of

Wofford and asked him whether there was "anything in [Wofford's] car that [Seng] need[ed] to

worry about."  (G. Ex. 41 Seng Footage Video 1 at 18:15:08 – 18:15:18).  Wofford replied in the

negative; Seng then informed Wofford that he would confirm the warrant's existence and would

release Wofford if there were no outstanding warrant.  (Tr. A 55-56; G. Ex. 41 Seng Footage

Video at 18:15:59 – 18:16:05).  Wofford was placed into the back of Seng's patrol vehicle.

(G. Ex. 41 Seng Footage Video 1 at 18:16:09).  While Wofford was in the back of the vehicle,

Seng asked him again whether there was anything in the vehicle that he should be concerned

about.  (Tr. A 96-97; G. Ex. 41 Seng Footage Video 1 at 18:16:17 – 18:16:32).

Seng left Wofford in the back of the patrol vehicle and looked into the interior of

the Traverse.  (Tr. A 57).  He did not detect the smell of marijuana coming from the vehicle and

was unable to recall whether he smelled any other odors, such as food, in the vehicle.  (Tr. A

57-58).  From his vantage point outside of the Traverse, Seng was able to observe several empty

plastic baggies in a console area located on the dashboard of the vehicle.  (Tr. A 59-60, 94).

According to Seng, he noticed the baggies only after Wilburn drew his attention to them.  (Tr. A

95).

At some point, Muller informed Seng that a K-9 unit would be called to the scene.

(Tr. A 60).  Seng did not participate in a search of the Traverse; rather, he transported Wofford to

an interview room at the Public Safety Building.  (Tr. A 60-61).  When they got to the interview

room, Seng conducted a search of Wofford's person, including of his waistband and pockets.

(Tr. A 62-63).  Seng recovered currency from Wofford's pocket, but was unable to recall how

much he found.  (Tr. A 63-64).  Seng returned the money to one of Wofford's pockets.  (Tr. A

63-64).  Seng later transported Wofford to booking at the Monroe County Jail.  (Tr. A 64-65).

### 2.    Wilburn's Testimony and Body Camera Footage

Wilburn testified that he had been employed as an RPD officer for approximately

five years.  (Tr. C 11-12).  On July 25, 2018, he assisted Seng in conducting a traffic stop of the

Traverse.  (Tr. C 14-15).  According to Officer Wilburn, on that day he was patrolling with Seng,

although he was driving his own vehicle.  (Tr. C 14-15).  Seng told Wilburn that he was planning

to stop the Traverse and activated his lights.  (Tr. C 14-15).  According to Wilburn, Wofford

immediately pulled his vehicle to the side of the road, partially blocking a driveway.  (Tr. C 23,

39-40, 42; G. Ex. 41A Video 1 at 18:13:07).  Wofford was not informed that his vehicle was

blocking the driveway, nor was he provided an opportunity to move the vehicle.  (Tr. C 40-41).

Wilburn testified that he did not receive complaints from anyone that the Traverse was blocking

the driveway.  (Tr. C 41).

Wilburn parked behind Seng, exited his vehicle, and approached the Traverse's

front passenger door.  (Tr. C 15, 20).  The windows of the Traverse were rolled down.  (G. Ex.

41A Video 1 at 18:13:12).  As Wilburn approached the vehicle, Seng ordered Wofford to exit the

vehicle.  (Tr. C 20).  Wofford did not immediately comply; with his taser drawn, Seng reached

into the vehicle to turn it off and take the keys.  (Tr. C 20, 41; G. Ex. 41A Video 1 at 18:13:16 –

18:13:29).  Wofford indicated that he was going to call his attorney, and Seng informed Wofford

that there was a warrant for his arrest.  (Tr. C 38; G. Ex. 41A Video 1 at 18:13:30 – 18:13:38).

Wofford then exited the vehicle.  (Tr. C 20; G. Ex. 41A Video 1 at 18:13:38).  Wilburn moved to

the driver's side of the vehicle to help Seng place Wofford in handcuffs, and he pointed his taser

at Wofford during this process.  (G. Ex. 41A Video 1 at 18:13:40 – 18:13:48).  Wofford was

attempting to use his phone to call his wife, but Wilburn took the phone from Wofford and promised to try to call Wofford's wife for him. (Tr. C 24-25, 38-39; G. Ex. 41A Video 1 at 18:13:48 – 18:14:10).

Seng secured the handcuffs on Wofford's wrists and escorted him to his patrol vehicle. (G. Ex. 41A Video 1 at 18:14:10 – 18:14:50). Wofford provided Wilburn with the passcode to his phone and his wife's phone number. (Tr. C 24-25, 39; G. Ex. 41A Video 1 at 18:14:50 – 18:15:03). Wilburn testified that he attempted to call the phone number, but the call did not go through. (Tr. C 48). Seng searched Wofford and placed him in the back of the patrol vehicle. (Tr. C 25; G. Ex. 41A Video 1 at 18:14:48 – 18:15:11).

Wilburn and Seng returned to the Traverse and inspected it from the outside. (Tr. C 25-26; G. Ex. 41A Video 2 at 18:28:57). From his position on the passenger side of the vehicle, Wilburn smelled an odor of food emanating from the vehicle and observed small plastic Ziploc bags located in the dashboard area of the vehicle. (Tr. C 21-22). Wilburn informed Seng that there was food in the vehicle and questioned whether the food would interfere with a canine sniff of the vehicle. (Tr. C 26; G. Ex. 41A Video 2 at 18:29:37 – 18:29:41). He also told Seng that he observed baggies on the dashboard of the vehicle. (Tr. C 27-28; G. Ex. 41A Video 2 at 18:29:41 – 18:29:55). Wilburn testified that he communicated his observations to both Muller and Hess. (Tr. C 21-22, 43-44).

Wilburn was directed to watch the Traverse while other officers applied for a search warrant. (Tr. C 28). When the warrant was issued, Wilburn assisted in searching the Traverse. (Tr. C 29; G. Ex. 41 Wilburn Footage). After the search was completed, Wilburn was instructed to have the Traverse towed. (Tr. C 30-31). Wilburn was aware that the vehicle was owned by Denise Wofford, but he did not make any attempts to contact her prior to towing the

vehicle. (Tr. C 45-46). Wilburn testified that RPD policy required that vehicles be searched for personal belongings prior to towing and that he completed a tow report cataloguing the items removed from the Traverse. (Tr. C. 31-33; G. Ex. 31). According to Wilburn, had the vehicle not been searched pursuant to the search warrant, it would have been searched in any event prior to towing. (Tr. C 31-33, 35). Wilburn testified that he could have had the vehicle towed because it was illegally parked. (Tr. C 36). Wilburn further testified that he would not have left the vehicle because it was illegally parked and was not safely secured. (Tr. C 36-37). According to Wilburn, the operator of the vehicle had been arrested, no one else was present to operate the vehicle, it was not safely secured, it was located in a high crime area, and it was illegally parked. (Tr. C 36-37, 51).

### 3. **Muller's Testimony**

On July 25, 2018, at approximately 6:10 p.m., Muller received a phone call from Seng informing him that he had observed Wofford driving the Traverse and that he intended to stop the vehicle. (Tr A 130; Tr. B 14). At the time, Muller knew that a federal warrant had been issued for Wofford's arrest. (Tr. A 130-31; Tr. B 14-15). Muller traveled to the 100 block of Glide Street and observed Seng taking Wofford into custody. (Tr. A 131). Muller did not approach Wofford or the vehicle at that time. (Tr. A 131-32; Tr. B 14-15).

Wilburn informed Muller that he had observed in the vehicle four small baggies typically used to package marijuana; based upon his knowledge of Wofford and the vehicle, Muller suggested that a K-9 officer respond to the scene to conduct a canine sniff of the exterior of the vehicle. (Tr. A 132; Tr. B 15-16; G. Ex. 26). Muller did not approach the vehicle to observe the baggies for himself and never learned that there was food on the passenger seat. (Tr. A 132-33).

According to Muller, he observed Hess arrive with his canine and conduct a sniff of the exterior of the vehicle.  (Tr. A 133; Tr. B 17).  Hess informed Muller that the canine had alerted for the presence of some type of drug in the front passenger door area of the vehicle. (Tr. A 133-34; Tr. B 17).  Muller left the scene to prepare an application for a search warrant for the Traverse.  (Tr. A 134; Tr. B 18; G. Ex. 30).

After obtaining approval for the warrant, Muller returned to Glide Street and participated in a search of the Traverse.  (Tr. A 136-37).  During the search, Muller located a plastic shopping bag on the floor area of the passenger side front seat.  (Tr. A 137).  The bag contained 32 bags of marijuana that appeared to be packaged for individual sales.  (Tr. A 137). Other items were also found in the vehicle, including prepared food located on the front passenger seat of the vehicle.  (Tr. A 138-39; G. Exs. 22-24).  After the search, Muller directed Wilburn to arrange to have the Traverse towed because "there was no one with the vehicle" and it was partially blocking a driveway.  (Tr. A 142).

### 4.    Hess's Testimony and Body Camera Footage

Hess testified that he had been employed as an officer with RPD for approximately fourteen years and had been assigned to the K-9 unit for approximately four-and-one-half years.  (Tr. C 54-55).  Officer Hess was partnered with a German Shepard named Kato, and together they participated in specialized training.  (Tr. C 55, 58).  Hess and Kato completed a fourteen-week patrol tracking school in which they learned to track for suspects and missing persons, engage in criminal apprehension, and conduct building and area searches for humans.  (Tr. C 58-60).  The training was administered by the New York State Division of Criminal Justice Services ("DCJS"), and Hess and Kato received a certification when they completed the program.  (Tr. C 60-61).  They were recertified in October 2018.  (Tr. C 62).

Hess and Kato also participated in narcotics detection training in 2016, in which Kato was trained to detect cocaine, heroin, ecstasy, methamphetamine, and marijuana. (Tr. C 63). Using narcotics and marijuana provided by the Drug Enforcement Administration, Kato was taught to alert when he located odors associated with those substances. (Tr. C 63-64). He was rewarded for his alerts initially with play; several years later, his play rewards were replaced by food rewards. (Tr. C 64-67). At the conclusion of the training program, Kato and Hess participated in a proficiency examination administered by the DCJS. (Tr. C 66, 70-71). The examination involved searches of packages, buildings, and vehicles for each of the five substances that Kato had been trained to detect. (Tr. C 70-71). Kato and Hess passed the examination and in February 2016 received a three-year certification for drug detection. (Tr. C 72). In February 2019, they participated in another proficiency examination and were recertified for another three years. (Tr. C 72-73).

In addition, Kato and Hess participate in regular training sessions at least twice a month involving both patrol tracking and narcotics detection skills. (Tr. C 73-74). Hess testified that during training sessions Kato has never alerted to any areas that did not contain narcotics, to his knowledge. (Tr. D 91). Training records reveal that during a building search training on December 28, 2017, the teams were taught to use long leads and an observer noted that Kato and Hess were searching with "eyes and not nose." (Tr. D 12-13). According to Hess, that training involved the use of longer leads in order to allow the handler to maintain a safe distance from the dog and to encourage the dog to search independently of the handler's influence. (Tr. D 13-15).

Hess testified that he and Kato have participated in both patrol tracking and narcotics detection investigations since receiving their certifications. (Tr. C 74-75). Most of the investigations have involved patrol tracking, but the team has also participated in several

23

narcotics investigations every year. (Tr. C 75). According to Hess, Kato has alerted in approximately twenty-five percent of these narcotics investigations. (Tr. C 105-106). Hess testified that he completes a K-9 usage log after every investigation to record whether the search was successful, unsuccessful, or not performed. (Tr. C 110-11). For narcotics searches, the term "successful" means that Kato alerted – regardless of whether drugs were actually present – and the term "unsuccessful" means that Kato did not alert. (Tr. C 111-12; Tr. D 16, 18, 22, 23, 25, 28-30, 56, 58, 62, 74).

Hess testified that during one investigation Kato positively alerted to the scent of narcotics or marijuana in areas in which those substances were not found. (Tr. C 76). Specifically, on April 20, 2018, Kato and Hess assisted in the search of a house, an SUV, and a shed in Fairport, New York (the "Fairport search"). (Tr. C 79; Tr. D 32, 77; D. Ex. L Videos 1-3). Hess was informed that investigators believed the vehicle had been used to transport narcotics and that narcotics had been stored inside the residence. (Tr. D 77-78). During the search of the vehicle, Kato alerted to the front console area and the trunk of the vehicle. (Tr. C 77-79; Tr. D 34-37; D. Ex. L Video 1). A glass vile containing suspected cocaine was found in the console area, but no drugs were located in the trunk. (Tr. C 77-79; Tr. D 35-37, 83).

During the search of the shed, Kato alerted to a chair by ripping open the bottom of the chair. (Tr. C 77-78; Tr. D 39-41, 80-81; D. Ex. L Video 3 at 17:23:41 – 17:23:44). Hess looked into the bottom of the chair and discovered a zippered pouch sewn into the lining of the bottom of the chair but did not locate any narcotics or marijuana. (Tr. C 77-78; Tr. D 42-43, 89-90; D. Ex. L Video 3 at 17:23:55 – 17:24:30). Hess testified that he did not consider Kato's alerts to be "false positive[s]." (Tr. C 79-80). Rather, Hess believed that Kato had accurately responded to the presence of odors he was trained to detect and that narcotics had recently been

present in the trunk of the SUV and in the chair, although they were no longer present at the time of Kato's searches. (Tr. C 80-81). According to Hess, one of the officers at the scene told him that they had information to suggest that narcotics had recently been transported in the trunk of the SUV. (Tr. C 80). Thus, Hess believed that the odor of narcotics had likely been present in the trunk and the chair even if the narcotics had no longer been there at the time of the searches. (Tr. C 80).

On July 25, 2018, Hess and Kato were asked to assist with the investigation of the Traverse. (Tr. C 83). When he arrived, Hess spoke with Muller and Seng and learned that the Traverse had been stopped and that Wofford had been arrested on a federal warrant for firearms possession and narcotics trafficking or possession charges. (Tr. C 83, 114; Tr. D 84). They also told him that they had observed some plastic bags consistent with narcotics trafficking inside the vehicle. (Tr. C 84, 93, 106; Tr. D 84). According to Hess, it was his practice to ask officers the basis for a requested narcotics search prior to commencing a search in order to ensure that the search was supported by reasonable suspicion. (Tr. C 106-108). Hess testified that he was either informed or observed that there was food inside the Traverse. (Tr. C 87, 94). Hess explained that he did not believe that the presence of food would affect Kato's search because Kato had been trained only to alert to the scent of narcotics or marijuana. (Tr. C 87-89).

Muller asked Hess to conduct an exterior search of the vehicle. (Tr. C 85). Hess testified that his practice was to start such a search at the left front corner of the vehicle and proceed in a counter-clockwise direction around the entire vehicle. (Tr. C 85-86). In order to orient Kato, Hess uses the command "sook" to direct Kato to search for the scent of narcotics. (Tr. C 85). As they proceed around the vehicle, Hess monitors Kato for any form of alert. (Tr. C 86). Hess explained that Kato has an aggressive alert when he detects a narcotics or marijuana

25

odor, which is characterized by biting, scratching or barking.  (Tr. C 86; Tr. D 27).  Hess will also "detail" Kato in order to try to get him to pay attention to areas he may have missed or to locate with more specificity the source of an odor to which Kato alerted.  (Tr. C 86; Tr. D 85).  When Kato alerts, Hess rewards him with kibbles.  (Tr. C 86-87).

Hess led Kato around the exterior of the Traverse, while repeatedly issuing the command "sook."  (Tr. C 92-93; G. Ex. 41 Hess Footage at 18:45:24 – 18:46:13).  According to Hess, as they passed the front passenger door, Kato commenced a different breathing pattern, which Hess interpreted to reflect that Kato was attempting to locate the source of one of the odors he has been trained to detect.  (Tr. C 118).  After reaching the front of the vehicle, Hess directed Kato back around the vehicle in a clockwise direction, drawing Kato's attention to areas of the vehicle that Kato had neglected to search, as they had been trained.  (Tr. C 94, 118-19, 122-23; Tr. D 85-86; G. Ex. 41 Hess Footage at 18:46:13).  Hess shortened the lead on Kato's leash and pointed to certain areas with his fingers.  (Tr. C 116-17).  According to Hess, as they proceeded clockwise around the vehicle, Kato again commenced a different breathing pattern and then alerted at the window of the front passenger door of the vehicle by scratching and barking.  (Tr. C 95-96, 118; G. Ex. 41 Hess Footage at 18:46:19 – 18:47:33).  Hess attempted to direct Kato's attention to other areas by pointing with his fingers, but Kato did not want to leave the source of the odor he had detected.  (Tr. C 96-97).  Hess rewarded Kato by giving him kibbles.  (Tr. C 96-98; G. Ex. 41 Hess Footage at 18:47:33 – 18:47:36).

After the search had been completed, Hess completed an affidavit in support of the search warrant application.  (Tr. C 99; G. Ex. 30 at App. A).  In the affidavit, Hess stated that Kato had "successfully tracked narcotics located in many different locations"; according to Hess, that statement was intended to convey that Kato had alerted to narcotics odors in those locations,

but not that narcotics necessarily had been located in those areas.  (Tr. D 93).  Hess further

affirmed that he had never known "Kato to falsely alert to the presence of narcotics."  (G. Ex. 30

at App. A).  The affidavit recited that he had conducted a narcotics search of the Traverse and

that Kato had alerted to the presence of narcotics.  (G. Ex. 30 at App. A).  Hess testified that he

did not include any information in the affidavit about the presence of food in the vehicle because

he did not believe that the food had affected the search.  (Tr. C 100-101).  He also did not

include any information about the Fairport search because Hess believed that Kato's alerts in the

search had been accurate and reliable.  (Tr. C 82).

### 5.  **Cumberbatch's Testimony**

Cumberbatch testified that on July 25, 2018, he arrived at the scene of the traffic

stop of the Traverse after Wofford was already in custody.  (Tr. B 99).  According to

Cumberbatch, he assisted Seng in escorting Wofford to an interview room in the Public Safety

Building and in searching Wofford when they arrived.  (Tr. B. 99, 102).  During the search, Seng

found money in Wofford's pocket.  (Tr. B 102).  Cumberbatch did not recall the total amount

found, but estimated that it exceeded $100.  (Tr. B 102).

### 6.  **Shields's Testimony**

The defense called William Shields ("Shields"), Ph.D., a professor emeritus of

animal behavior, to testify as an expert regarding the reliability of dog scent evidence, including

the subject of the manner in which human and human handler behavior may affect the reliability

of canine searches.  (Tr. E 2-7).  Dr. Shields testified regarding animal behavior studies

demonstrating that a human handler may cue the behavior of a canine and thus generate false

positive alerts.  (Tr. E 15-19, 23-24; D. Exs. O, P).  Due to the risk of cueing, Shields opined, it

is preferable for a handler conducting a canine search to have limited knowledge of the locations where narcotics are suspected to be found.  (Tr. E 29).

Shields testified that he had reviewed Hess's testimony and the video footage of Kato's April 20 and July 25, 2018 searches.  (Tr. E 7).  According to Shields, he concluded that it was possible that Hess's conduct during the July 25, 2018 search – including issuing repeated commands to Kato to "sook," pointing with his hands, and shortening the leash – cued Kato to alert at the passenger window of the Traverse, particularly considering that Kato's first rotation of the car did not produce an alert.  (Tr. E 27-31).  Shields also testified that he did not have any knowledge of whether Hess used the "sook" command repeatedly during his training with Kato and did not know whether it was common practice to use repeated commands in the law enforcement K-9 detection field.  (Tr. E 32, 35).  According to Shields, the use of repeated commands during a search would be less likely to cue an alert if the dog's training had also involved the use of repeated commands.  (Tr. E 32).

### 7.    Wofford's Affidavits

Wofford submitted two affidavits that address the circumstances of the July 25, 2018 traffic stop.  (Docket ## 37-1 at 10; 40).  Wofford avers that he was operating the Traverse that day on Glide Street when the police pulled him over.  (Docket ## 37-1 at 10, ¶ 17; 40 at ¶ 4). Prior to the stop, Wofford had stopped at the fish market located at the intersection of Main Street and Jefferson Avenue to purchase three dinners of fish, shrimp, coleslaw, and french fries. (Docket # 40 at ¶ 5).  Wofford states that the three dinners were packaged in Styrofoam containers in a plastic bag on the front passenger seat of the Traverse.  (*Id.* at ¶ 6).

According to Wofford, as soon as the officers approached his vehicle, he provided them with his license and the vehicle registration.  (Docket # 37-1 at 10, ¶ 18). Wofford informed

Seng that he had "just grabbed" something from the fish market. (Docket # 40 at ¶ 7). Wofford states that an officer pointed a taser at him and ordered him to get out of the Traverse. (Docket # 37-1 at 10, ¶ 19). Wofford asked to call his attorney; as he exited the vehicle, he was informed that there was a warrant for his arrest. (*Id.* at ¶¶ 19-20). The three dinners remained on the front passenger seat when Wofford left the Traverse. (Docket # 40 at ¶ 6).

Wofford was handcuffed, placed into the back of a patrol vehicle, and asked questions. (Docket # 37-1 at 10, ¶¶ 20-21). According to Wofford, he was not provided with *Miranda* warnings before making any statements. (*Id.* at ¶ 23). Wofford also states that he did not provide the officers with consent to search the Traverse. (*Id.* at ¶ 22).

## REPORT & RECOMMENDATION

Wofford seeks to suppress all evidence seized and any statements he made during the traffic stops conducted on February 20 and July 25, 2018. (Docket ## 37, 40, 69, 70).

## I.    Tangible Evidence

### A.    February 20, 2018 Traffic Stop

Wofford seeks to suppress any evidence seized from the Traverse on February 20, 2018 on the grounds that the officers lacked a lawful basis to conduct the traffic stop. According to Wofford, he did not commit a traffic infraction, and the officers did not otherwise have reasonable suspicion to stop the vehicle. (Docket # 69 at 5-11). Even if he had committed a traffic infraction, Wofford maintains, the officers lacked probable cause to search the vehicle based upon the odor of marijuana. (*Id.* at 11-15).

The government opposes the motion on the grounds that the officers lawfully stopped the Traverse because the information Muller had developed in his investigation of Wofford's stolen car, which suggested that Wofford was engaged in narcotics trafficking activities, coupled with his observations of suspected trafficking activity by the occupant inside the Traverse on February 20, 2018, provided reasonable suspicion to believe that criminal activity involving the vehicle was occurring.  (Docket # 73 at 10-11).  Alternatively, the government contends that Seng's observation of a traffic infraction provided an independent basis to justify stopping the Traverse.  (*Id.* at 11).  The government also argues that the subsequent search of the Traverse was justified based upon the odor of marijuana coming from the vehicle and Muller's observation of suspected marijuana in plain view in the back of the Traverse.  (*Id.* at 11-14).  Alternatively, the government maintains that the search of the Traverse should be upheld as properly conducted incident to Wofford's arrest or as an inventory search following Wofford's arrest.  (*Id.* at 11-17).

An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment, *United States v. Wallace*, 937 F.3d 130, 137 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2551 (2020), and must be justified by "probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity," *id.* (quoting *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017)); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree

doctrine and may be suppressed." *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001)

(quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994));

*see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

      On a motion to suppress, the defendant bears the initial burden of establishing that

a government official acting without a warrant subjected him to a search or seizure. *See United*

*States v. Peeples*, 962 F.3d 677, 692-93 & n.59 (2d Cir.) (citing *Rakas v. Illinois*, 439 U.S. 128,

130 n.1 (1978) ("[t]he proponent of a motion to suppress has the burden of establishing that his

own Fourth Amendment rights were violated by the challenged search or seizure")), *petition for*

*cert. docketed*, No. 20-6590 (2020). Where the defendant does so, the burden then shifts to the

government to demonstrate by a preponderance of the evidence that the search or seizure did not

violate the Fourth Amendment. *United States v. Strachon*, 354 F. Supp. 3d 476, 483 (S.D.N.Y.

2018) ("[o]nce the movant establishes some basis for the suppression motion, the burden of

proof shifts to the [g]overnment, which then carries the burden to demonstrate by a

preponderance of the evidence that the search or seizure did not violate the Fourth

Amendment").

      Seng testified that he observed the driver of the Traverse commit a traffic

infraction by failing to signal at least 100 feet before turning onto Danforth Street. Wofford

asserts that his failure to signal more than 100 feet before the turn did not constitute a violation

of N.Y. Vehicle and Traffic Law Section 1163(b). I disagree. N.Y. Vehicle and Traffic Law

Section 1163 provides:

      (a) No person shall turn a vehicle at an intersection . . . without
      giving an appropriate signal in the manner hereinafter provided.

      (b) A signal of intention to turn right or left when required shall be
      given continuously during not less than the last one hundred feet
      traveled by the vehicle before turning.

* * *

> (d) The signals . . . shall be used to indicate an intention to turn, change lanes, or start from a parked position and not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or "do pass" signal to operators of other vehicles approaching from the rear.

N.Y. Vehicle and Traffic Law §§ 1163(a), (b), (d).

Wofford maintains that his conduct – signaling an intent to turn left while stopped at a stop sign – is governed by Section 1163(d) rather than 1163(b). (Docket # 69 at 8-11). According to Wofford, Section 1163(d) governs the use of a turn signal by a vehicle turning from a stationary position, while Section 1163(b) governs the use of a turn signal by a vehicle that is traveling "continuously." (*Id.*). He reasons that because the 100-foot requirement in Section 1163(b) applies only to vehicles in continuous motion, and because he was stopped at a stop sign, he did not violate the law by failing to signal 100 feet before turning left onto Danforth Street. (*Id.*). I do not find this reasoning persuasive.

A plain reading of Section 1163 does not support Wofford's interpretation. As an initial matter, the word "continuously" in subsection (b) applies to the use of the turn signal itself and not to the movement of the vehicle. In other words, it requires the turn signal to be used continuously during the 100 feet preceding a turn. Section 1163(d) merely makes clear that a driver must use a turn signal to indicate an intention to turn, change lanes, or enter the roadway from a parked position and prohibits its use for other purposes, including to indicate that a vehicle is disabled or to communicate a "no pass" message to another vehicle. Nothing in the statute suggests that Section 1163(d), rather than subsection (b), applies to instances in which a vehicle temporarily stops at an intersection during the course of its travels. Accordingly, I conclude that Section 1163(b) requires vehicles, such as the Traverse that Wofford was driving on February 20, 2018, to signal continuously during the 100 feet preceding a turn at an

intersection marked by a stop sign. *But see People v. Brandt*, 60 Misc.3d 956 (N.Y. City Ct. 2018) ("subdivision (b) applies to motor vehicles continuously traveling before turning and requires a signal of an intention to turn 'during not less than the last 100 feet traveled,' whereas subdivision (d) applies to those vehicles (not continuously traveling) that must also signal their intention to turn – but does not require a signal during the last 100 feet previously traveled").

I also disagree with Wofford's contention that Seng's testimony that he observed the violation as not credible. (Docket # 69 at 10). Despite Wofford's suggestion that Seng could not have observed the infraction while making a U-turn, Seng credibly testified that he kept the vehicle in his view during the maneuver by using his side-view mirror. (Tr. A 17, 22, 71, 75). Further, although Muller, Grillo, Perrone, and Montinarelli, offered differing justifications for the stop while they were on scene, it was Seng – not the other officers – who observed the infraction and initiated the traffic stop. Moreover, Seng's testimony regarding the violation is corroborated by the video footage showing the first flash of the turn signal when the Traverse was almost upon the stop sign. (G. Ex. 2 at 5:34:15). On this record, I find that sufficient reasonable cause existed to justify the stop. *See*, *e.g.*, *Whren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Goolsby*, 820 F. App'x 47, 49 (2d Cir.) (summary order) (officer "had more than a reasonable suspicion that [defendant] committed a traffic violation because he saw [defendant] fail to use his turn signal 100 feet before turning, a violation of section 1163(b) of the New York State Vehicle and Traffic Law"), *petition for cert. docketed*, No. 20-6662 (2020); *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop"); *United States v.*

*Jenkins*, 452 F.3d 207, 212 (2d Cir.) ("because the officers had a reasonable but mistaken belief that the SUV lacked license plates, stopping the vehicle was 'justified at its inception'"), *cert. denied*, 549 U.S. 1008 (2006); *United States v. Scopo*, 19 F.3d at 782 ("[w]hen an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle") (internal quotation omitted); *United States v. Tillard*, 2019 WL 8105894, *4 (W.D.N.Y. 2019) (officers had probable cause to initiate traffic stop where they witnessed conduct that "violated section 1163(b) of New York's Vehicle and Traffic Law which provides that a signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning") (internal quotation omitted), *report and recommendation adopted by*, 2020 WL 57198 (W.D.N.Y. 2020); *United States v. McIntyre*, 2019 WL 4454361, *3 (W.D.N.Y.) (same), *report and recommendation adopted by*, 2019 WL 3228892 (W.D.N.Y. 2019); *United States v. Brookins*, 2018 WL 9539171, *2 n.3, 4 (W.D.N.Y. 2018) (same).

In any event, even if Wofford's construction of Section 1163(d) were correct, Seng's belief that Wofford had committed a traffic infraction, although mistaken, would have been objectively reasonable.  *See Heien v. North Carolina*, 574 U.S. 54, 66 (2014) ("[t]he Fourth Amendment tolerates . . . reasonable mistakes, and those mistakes – whether of fact or of law – must be objectively reasonable") (emphasis omitted).  "The test for whether an officer's mistake of law was objectively reasonable . . . is satisfied only when the law at issue is so doubtful in construction that a reasonable judge could agree with the officer's view."  *United States v. Diaz*, 854 F.3d 197, 204 (2d Cir. 2017) (internal quotations and brackets omitted), *cert. denied*, 138 S. Ct. 981 (2018).

Seng's belief that Section 1163(b) applied to a vehicle temporarily stopped at an intersection stop sign during the course of its travels was an objectively "reasonable interpretation of an ambiguous state law, the scope of which had not been clarified." *See id.* Indeed, this Court has found no New York authority predating the stop interpreting Section 1163 as Wofford has, although at least one New York court had upheld a traffic stop premised on Seng's interpretation of Section 1163. *See People v. Tamburrino*, 26 Misc.3d 930, 932 (N.Y. City Ct. 2009) (upholding traffic stop of vehicle for failing to signal at least 100 feet prior to turning after stopping at red light). Although Wofford has identified one later case interpreting Section 1163 as he has, *see People v. Brandt*, 60 Misc.3d at 961, he also acknowledges that the Second Circuit observed in a subsequent case that even if the district court had erred by not finding that the Section 1163(b) stop was unlawful, the question "whether §1163(b) or §1163(d) applies to a car stopped at a stop sign is, at best, an open question in New York," *see United States v. Whitaker*, 827 F. App'x 39, 42 (2d Cir. 2020) (summary order).

In sum, I conclude that the Fourth Amendment was not offended by Seng's traffic stop of the Traverse on February 20, 2018 because (1) Seng observed the driver commit a violation of Section 1163(b) by not engaging his turn signal continuously for 100 feet before turning at the stop sign; and (2) even if Seng had been wrong that the conduct he observed violated Section 1163(b), his belief was objectively reasonable. Accordingly, I recommend that the district court reject Wofford's challenge to the lawfulness of the stop based upon his objectively reasonable, even if mistaken, understanding of Section 1163 of New York's Vehicle and Traffic Law.[5]

---

[5] Having concluded that Seng had probable cause to believe that a traffic violation occurred, I need not resolve the issue of whether Seng was likewise justified in stopping the Traverse based upon reasonable suspicion of narcotics trafficking. *See United States v. Lucas*, 338 F. Supp. 3d 139, 156 (W.D.N.Y. 2018).

To the extent that Wofford's post-hearing memorandum may be read to suggest that Seng's testimony should not be credited because the alleged violations were merely pretextual reasons for stopping the vehicle, I disagree.[6]  Although the hearing testimony certainly suggests that Seng and Muller were surveilling the Traverse with the intent of stopping it in the event that a traffic violation occurred (*see* Tr. A 84; Tr. B 109), I disagree that such intent renders the stop unlawful.  The law is clear that an officer's subjective motivation for a traffic stop does not determine the lawfulness of the stop.  *See Whren v. United States*, 517 U.S. at 813 ("the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved") (citations omitted); *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) ("[i]f an officer has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable"); *United States v. Tisdol*, 290 F. App'x 384, 386 (2d Cir. 2008) (summary order) ("[t]o the extent [defendant] argues that the pretextual use of a traffic violation to stop the cab compelled suppression of the drugs seized from him, the law is to the contrary").

Once the Traverse was stopped, the smell of marijuana emanating from it provided the officers with reasonable suspicion to investigate Wofford's activities and probable cause to search the vehicle.[7]  "The 'automobile exception' permits law enforcement officers to search without a warrant 'a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband.'"  *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017)

---

[6]  The government reads Wofford's memorandum to include this contention; I am unclear whether it does but will address it in an abundance of caution.

[7]  Having concluded that the smell of marijuana provided a lawful basis to conduct a search of the vehicle, I need not reach the government's alternative arguments that the search was properly conducted as an inventory search following Wofford's arrest (Docket # 73 at 14-17) or incident to his arrest for possession of cocaine, marijuana, and a firearm (*id.* at 11).  I also note that the cocaine and firearm were not discovered until after the search of the vehicle.

(quoting *United States v. Navas*, 597 F.3d 492, 497 (2d Cir.), *cert. denied*, 562 U.S. 954 (2010)). If an officer has probable cause to believe that a vehicle contains contraband, the permissible scope of the search extends anywhere within the vehicle that the contraband may be located, including containers or packages. *Id.* "Where, as here, a vehicle emits the odor of a controlled substance, officers have probable cause to search anywhere in the vehicle in which the controlled substance may be located." *United States v. Wiggins*, 2013 WL 1645180, *12 (W.D.N.Y.), *report and recommendation adopted by*, 2013 WL 2553971 (W.D.N.Y. 2013); *see United States v. Goolsby*, 820 F. App'x at 49 ("[u]pon approaching the car, [the officer] had probable cause to search for evidence related to a marijuana offense[;] [the officer] smelled the odor of burnt marijuana when he approached"); *United States v. Spain*, 2019 WL 948814, *3 (S.D.N.Y. 2019) ("a generalized smell of marijuana provides police with the right to search a defendant's vehicle and any containers within the vehicle where marijuana might be stored") (internal quotations omitted); *United States v. James*, 2011 WL 6306721, *6 (S.D.N.Y. 2011) (search of knapsack found in vehicle justified by the odor of marijuana emanating from vehicle and knapsack), *aff'd*, 520 F. App'x 41 (2d Cir.), *cert. denied*, 571 U.S. 907 (2013); *United States v. Colon*, 2011 WL 569874, *12 (S.D.N.Y. 2011) (denying suppression of gun where officers' detection of marijuana odor justified search of vehicle, including glove compartment where gun was found); *United States v. Dixon*, 2010 WL 3167381, *3 (W.D.N.Y.) (smell of burning marijuana provided probable cause to search entire minivan) (collecting cases), *report and recommendation adopted by*, 2010 WL 3167380 (W.D.N.Y. 2010). The right to search the car under these circumstances does not depend upon the officers' ability to determine the quantity of marijuana suspected to be in the car. *United States v. Colon*, 2011 WL 569874 at *12 ("[b]ecause the possession of marijuana is unlawful, marijuana is a form of contraband [;] . . . [u]pon encountering the

suspicious smell, [the officers] had probable cause to believe the car contained contraband, namely, marijuana").

In this case, five law enforcement officers present at the scene – Seng, Grillo, Cumberbatch, Muller, and Perrone – each testified that they smelled the odor of marijuana emanating from the Traverse. Their testimony in this respect was unequivocal and is not undermined by their inability to recall or distinguish whether the smell was of burnt or unburnt marijuana. The fact that Seng asked Wofford whether he had been smoking earlier does not establish that Seng detected the odor of burnt rather than unburnt marijuana. Significantly, none of the officers testified that they recalled smelling the odor of burnt marijuana, and each who could recall or distinguish the scent testified that the odor was of unburnt marijuana. (Tr. A 28-30, 70-71 (Seng); Tr. A 121, 157-58, Tr. B 9 (Muller); Tr. B 60, 77, 79 (Grillo); Tr. B 31-32, 44, 55 (Perrone); Tr. B 92-93, 108 (Cumberbatch)). On this record, I find credible the officers' testimony that they smelled the odor of marijuana coming from the Traverse. Accordingly, I recommend that the district court uphold the search of the Traverse and deny Wofford's motion to suppress evidence seized as a result of the February 20, 2018 traffic stop.

## B.  July 25, 2018 Traffic Stop

Wofford seeks to suppress evidence seized from the Traverse on July 25, 2018, on the grounds that the canine search was unreliable and that the affidavit submitted in support of the warrant to search the Traverse contained false and misleading statements and material omissions. (Docket # 69 at 18-26). Wofford also maintains that the inevitable discovery doctrine does not apply because the officers had no lawful basis to impound the vehicle. (Docket # 70). The government opposes suppression, contending that there are no false or misleading statements in the affidavit, and, in any event, the warrant is supported by probable cause.

(Docket # 73 at 19-20).  The government further argues that the evidence would inevitably have been discovered during an inventory search of the vehicle.[8]  (*Id.* at 16-17).

   The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for . . . conclud[ing]' that probable cause existed."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases . . . should be largely determined by the preference to be afforded to warrants."  *United States v.*

---

[8]  The government also maintains that the currency found on Wofford's person was lawfully seized during a search incident to his arrest pursuant to the federal arrest warrant.  (*Id.* at 21-22).  To the extent that Wofford challenges the arrest warrant on the grounds that it was based upon evidence seized during the February 20, 2018 traffic stop, I recommend that his motion be denied for the reasons discussed above.  It is unclear whether Wofford otherwise challenges the seizure of the currency found on his person; insofar as he does, I agree with the government that it was found during a lawful search of his person after his arrest.  *See United States v. DiMarco*, 2013 WL 444764, *9 n.8 (S.D.N.Y. 2013) ("[t]he modern search incident to arrest exception also includes an exception for the 'routine' inventory of an arrestee and any article on the arrestee's person incident to incarcerating that arrested person"); *United States v. Coates*, 739 F. Supp. 146, 152 (S.D.N.Y. 1990) ("[p]olice officers are entitled under the Fourth Amendment to conduct a warrantless search of the personal effects and baggage of a person under lawful arrest as part of routine administrative procedure incident to booking and jailing a suspect").

*Ventresca*, 380 U.S. 102, 109 (1965).  "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause."  *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013), *cert. denied*, 573 U.S. 916 (2014).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154).  To determine whether a misstatement in an affidavit is material, the court must "set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions [of the application] suffice to support a probable cause . . . finding."  *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert. denied*, 573 U.S. 916 (2014).  According to the Second Circuit, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause."  *Id.* at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

In this case, the challenged statements and omissions pertain to the reliability of Kato as a drug detection dog and the reliability of the July 25, 2018 canine search.  In one of his affidavits submitted in support of the warrant, Hess stated that "Kato has successfully tracked narcotics located in many different locations, to include packages, motor vehicles, building and outdoors."  (G. Ex. 30 at App. A).  Wofford maintains that the use of the term "successfully" is misleading because it conveyed that Kato's positive alerts in the field resulted in the discovery of narcotics when in fact the word was meant to convey only that Kato had provided positive alerts

40

to narcotics in many different locations in the field.  Hess also stated in that affidavit that he has "never known Kato to falsely alert to the presence of narcotics."  (*Id.*).  Wofford maintains that this statement is false because it omitted information concerning the April 20, 2018 Fairport search in which narcotics were not located in two areas (a vehicle trunk and a chair) to which Kato positively alerted.

Although inclusion of information that Kato occasionally had alerted to locations in which drugs were not located, accompanied by an explanation as to why Hess nonetheless believed those alerts were not false positives, might have been the better practice and would have foreclosed this challenge, I disagree that its omission was materially misleading.  As Hess explained, he believed that Kato properly alerted to the odor of narcotics that recently had been in the trunk of the SUV and the chair but had been removed prior to the search.  In other words, even if the statement concerning Hess's knowledge that Kato had not provided false alerts was clarified to explain the circumstances of the Fairport search, it still would have supported the assessment that Kato's positive alerts were reliable.

By contrast, I agree with Wofford that the other challenged statement was misleading.  A judicial officer reviewing the statement that Kato had "successfully tracked narcotics in many different locations" would reasonably have understood it to mean that Kato had *correctly found* narcotics many times in the field, not simply that he had provided many positive alerts.  That said, I find that even if the statement were stricken from the affidavit, the remaining information in the application would have been sufficient to permit reliance on Kato's July 25, 2018 positive alert in determining that probable cause existed to search the Traverse.

In his affidavit, Hess provided information about Kato's proficiency in detecting narcotics during his training and certification evaluations.  (G. Ex. 30 at App. A).  As the

41

Supreme Court has recognized, in evaluating a canine's reliability, data from their performance during training and certification, rather than data from their performance in the field, provides a more accurate picture of the canine's proficiency.  *See Florida v. Harris*, 568 U.S. 237, 245 (2013) ("[e]rrors may abound in [field] records[,] . . . [and] [f]ield data . . . may markedly overstate a dog's false positives[;] . . . [t]he better measure of a dog's reliability thus comes away from the field, in controlled testing environments").  This is particularly true in the context of possible "false positives" where the canine alerts but the officer is unable to locate any narcotics. *See id.*  As the Supreme Court has acknowledged, and Hess testified, such alerts may not be mistakes; instead, they may result from the canine's detection of substances that are either too well-hidden or too small in quantity for human detection or of residual odors of drugs that were previously present but were no longer at the time of the alert.  *See id.*

Hess stated that Kato had successfully completed Drug Detector Dog School and was tested and certified by DCJS.  (G. Ex. 30 at App. A).  According to Hess, Kato is re-examined and re-certified for drug detection by DCJS every three years.  (*Id.*).  Kato also participates in training several times each month, "during [which,] Kato consistently demonstrates a high degree of proficiency in locating the hidden narcotics."  (*Id.*).  I find that this information, along with the information about the absence of false alerts to Hess's knowledge, provided a sufficient basis upon which to conclude that Kato's July 25, 2018 alert was reliable and that probable cause existed in support of the issuance of the warrant.  *See United States v. Jenkins*, 2017 WL 9485700, *7 (W.D.N.Y. 2017) (evidence of canine's three false positives in the field insufficient to render reliance on canine alert unreasonable), *report and recommendation adopted by*, 2018 WL 324901 (W.D.N.Y. 2018).

Contrary to Wofford's contention, I do not find that the manner in which the July 25 search was conducted rendered Kato's positive alert unreliable or that the inclusion of information about it in the application was improper. As a general matter, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. at 246-47. Nevertheless, "a defendant 'must have an opportunity to challenge ... evidence of a dog's reliability,' whether by (1) 'cross-examining the testifying officer,' (2) 'introducing his own fact or expert witnesses,' (3) contesting 'the adequacy of a certification or training program,' or (4) inquiring whether 'circumstances surrounding a particular alert may undermine the case for probable cause.'" *See United States v. McKenzie*, 2015 WL 13840885, *12 (N.D.N.Y. 2015) (quoting *Harris*, 568 U.S. at 247). Where a defendant challenges "the reliability of the dog overall or of a particular alert," the court should "weigh the competing evidence" to determine whether the "facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

Wofford maintains that the hearing evidence demonstrates that Kato alerted not to the scent of marijuana but to Hess's cues, including a shortened leash, his repeated commands to "sook," and his hand gestures. (Docket # 69 at 23-26). According to Wofford, the manner in which Hess conducted the search was inconsistent with his training, which included the use of long leads to encourage independence. (*Id.*). In support of his position, Wofford emphasized Shields's opinion that it was possible that Hess's conduct prompted Kato's alert. (*Id.*).

Viewing the evidence "through the lens of common sense," I find that a reasonably prudent person would conclude that Kato's positive alert supported the belief that a

search of the Traverse would reveal evidence of contraband or a crime.  As an initial matter, although Shields testified that it would have been better practice to limit the information provided to the handler, nothing in the testimony or video footage establishes that Hess was aware of any specific locations inside the Traverse where marijuana was suspected to be located. Rather, the evidence shows that although he walked around the vehicle prior to the canine search and had been informed that plastic baggies had been observed, Hess was not told of the location of the shopping bag that was ultimately recovered from inside the vehicle.  (Tr. C 43-44).

Next, although Wofford contends that Hess acted contrary to his training by shortening Kato's lead, this contention rests upon a single training notation concerning the use of longer leads.  Hess testified that the notation related to exercises involving building searches for persons, and his conduct in directing the search of the Traverse was consistent with his training in conducting narcotics detection searches.  (Tr. C 93-94, 117; Tr. D 13-15, 48-50, 85, 95).  Hess also testified that the length of the lead does not affect Kato's performance.  (Tr. D 50, 85).

With respect to the use of repeated commands to "sook," Hess testified that he has never known Kato to aggressively alert solely in response to the use of that command.  (Tr. D 86).  Further, Shields conceded that he had no knowledge of the manner in which Kato was trained, including whether that training involved the use of repeated commands to search, and that such information would be relevant to his evaluation of the July 25 search.  (Tr. E 32, 35). Finally, Hess testified that his use of his hands to identify specific areas for Kato to search comports with his training and he does not believe that Kato has ever provided an aggressive alert in response to his hand gestures.  (Tr. D 85-86, 95).

Although Wofford has presented evidence that canine searches may be influenced by cues from the canine handlers, I find that the record here lacks persuasive evidence to find

44

that the alert provided by Kato, a regularly trained and certified drug detection dog, was unreliable or that the issuing judge's reliance upon it in issuing the warrant was unreasonable. The evidence demonstrates that Hess and Kato conducted the search consistent with their training, that Kato's breathing pattern changed as he first passed the passenger door, and that he aggressively alerted to that area when Hess directed him to search it more closely. Indeed, after Kato's alert, Hess attempted to direct the dog's attention to other areas, but Kato was reluctant to leave the area – evidence that supports the conclusion that Hess's use of repeated commands and hand gestures did not undermine the reliability of Kato's alert. Once Kato alerted at the passenger door, it was reasonable to conclude that narcotics or marijuana would be located within the vehicle. Accordingly, I recommend that the district court uphold the warrant authorizing a search of the Traverse and deny Wofford's motion to suppress evidence seized after the July 25, 2018 search of the vehicle.[9]

## II.    Statements

Wofford has moved to suppress all statements he made during the February and July 2018 traffic stops. (Docket # 69 at 15-17, 27-28). According to Wofford, any statements he made were procured in violation of his *Miranda* rights and were otherwise involuntary. (*Id.*). Additionally, Wofford maintains the statements he made on February 20, 2018, were the product

---

[9] I do not reach the government's alternative argument that sufficient probable cause existed to support the warrant even in the absence of Kato's alert. Nor do I reach the government's alternative argument that the Traverse inevitably would have been searched after it had been impounded because the operator of the vehicle had been arrested, no one else was present to operate the vehicle, and it was unsecure and illegally parked in a high crime area. *See United States v. Lyle*, 919 F.3d 716, 728 (2d Cir 2019) ("[i]t is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions – an authority that is beyond reasonable challenge"), *cert. denied*, 140 S. Ct. 846 (2020).

of the unlawful stop of his vehicle.[10]  (*Id.* at 15).  The government opposes the motion to the extent Wofford seeks to suppress any statements he made while he was inside the Traverse during the two traffic stops.[11]  (Docket # 73 at 24).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

---

[10]  In his papers, Wofford cites the Sixth Amendment right to counsel as a legal justification for suppression of his statements.  (Docket # 69 at 15, 27).  It does not appear, however, that at the time of the challenged statements, his Sixth Amendment right to counsel had attached.  *See Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (Sixth Amendment right to counsel attaches at the commencement of prosecution which includes "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment") (internal quotation omitted); *United States v. Moore*, 670 F.3d 222, 234 (2d Cir.) ("[i]f, as true at the time of [defendant's] questioning here, no formal charging instrument has yet been filed, the [Sixth Amendment] right to counsel generally attaches at the first appearance [by the accused] before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty") (internal quotation omitted), *cert. denied*, 567 U.S. 943 (2012).  At the time of the July 25, 2018 arrest, the pending federal indictment had yet to be returned (Docket # 26), and Wofford's statements during the arrest suggest that any state charges had been dismissed.  (G. Ex. 41 Seng Footage Video 1 at 18:14:20 – 18:14:30).

[11]  The government's submission does not challenge Wofford's motion to suppress statements he made after exiting the vehicle on either February 20 or July 25.  (Docket # 73 at 24).  Accordingly, the Court recommends granting Wofford's unopposed motion relating to any such statements.

In determining whether a defendant was in custody, a court must undertake a two-part analysis. *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018). First, the court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave." *Id.*; *see United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 125 S. Ct. 371 (2004). If the answer is affirmative, the inquiry concludes. *United States v. Newton*, 369 F.3d at 672. If, however, a reasonable person would not have felt free to leave, the court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, "there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d at 60.

"Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Newton*, 369 F.3d at 672 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave"). Thus, "[a]lthough both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized[,] . . . a necessary, but not sufficient, condition [of custody]." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotations omitted). Considerations relevant to the second inquiry include "whether the suspect [was] told that he or she [was] free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject [was] searched or frisked, and the length of the interrogation." *Santillan*, 902 F.3d at 60.

Although traffic stops are not exempt *per se* from the reach of *Miranda*, *see*, *e.g.*, *United States v. Newton*, 181 F. Supp. 2d 157, 170 (E.D.N.Y. 2002) ("the Supreme Court did not adopt a bright-line rule that *Miranda* warnings are never required during [traffic] stops") (citing *Berkemer v. McCarty*, 468 U.S. at 440), *aff'd*, 369 F.3d 659 (2d Cir.), *cert. denied*, 543 U.S. 947 (2004), routine traffic stops generally do not constitute custodial settings, *see Berkemer*, 468 U.S. at 440-42 (the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*"); *Newton*, 369 F.3d at 669 (routine traffic stops do not constitute custodial detentions for purposes of *Miranda*); *United States v. Fernandez-Jimenez*, 2004 WL 1598653, *5 (S.D.N.Y. 2004) ("[a]lthough motorists do not feel free to leave, traffic stops are not a form of custodial interrogation because they are brief and public") (citation omitted); *United States v. Perez*, 2002 WL 1835601, *6 (S.D.N.Y. 2002) ("persons temporally detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*") (citation omitted).

Interrogation is not limited to "express questioning"; rather, it extends to the "functional equivalent" of questioning, namely, "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Broughton,* 600 F. App'x 780, 783 (2d Cir. 2015) (summary order) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 300-301 (1980)).  The Second Circuit has reaffirmed that the determination whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response should be made upon "the totality of the circumstances." *Id.* (quoting *Acosta v. Artuz,* 575 F.3d 177, 191 (2d Cir. 2009)).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (summary order) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d at 233 (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)).

A.    **February 20, 2018 Statements**

Having concluded that the February 20, 2018 traffic stop was lawful, I find that suppression of Wofford's subsequent statements is not warranted under the fruit of the poisonous tree doctrine. Wofford also asserts conclusorily that his statements were involuntary. I disagree. Although the circumstances of the traffic stop may have been intimidating and culminated with efforts by law enforcement officers to break a window of the Traverse, I find that the circumstances were not sufficient to overbear Wofford's will and render his statements involuntary. Wofford argued with the officers throughout the encounter about the legality of the stop, asserted his right to speak to his attorney, and demanded that they obtain a warrant.

Nothing about Wofford's demeanor or conduct during the interaction suggests that his will was overborne.

Wofford also argues that any statements he made while he was in the Traverse were the product of unwarned custodial interrogation. (Docket # 69 at 15-17). The government counters that Wofford was neither in custody when he was in the Traverse nor subjected to interrogation. (Docket # 73 at 24).

I agree with the government that the encounter between Wofford and law enforcement began in a non-custodial manner. Seng approached the vehicle, informed Wofford that he was conducting a traffic stop, and asked Wofford for his license and registration. (G. Ex. 40 Seng Footage Video 1 at 17:35:06 – 17:35:32). That Seng questioned Wofford concerning the smell of marijuana did not transform the stop into a custodial detention. *See United States v. Mitchell*, 2012 WL 6827387, *2, 10 (W.D.N.Y. 2012) (defendant was not in custody during traffic stop where officer detected strong odor of marijuana, asked occupants to exit the vehicle, performed pat-down of driver, placed him in patrol car, and questioned him about marijuana smell), *report and recommendation adopted by*, 2013 WL 132459 (W.D.N.Y. 2013); *United States v. Evans*, 2012 WL 5871611, *5 (S.D.N.Y. 2012) (no custodial interrogation where officer questioned defendant about odor of marijuana in vehicle); *Miller v. Hedgpeth*, 2011 WL 8333065, *8 (C.D. Ca. 2011) (defendant not in custody where "two deputies conducted a traffic stop, [one deputy] approached the car, smelled marijuana, and asked [defendant] if he had marijuana in the car"), *report and recommendation adopted by*, 2012 WL 3127960 (C.D. Cal. 2012); *United States v. Walters*, 563 F. Supp. 2d 45, 47-48, 51-52 (D.D.C. 2008) (defendant, who had been stopped for illegal tint, was not in custody when officer approached vehicle,

smelled marijuana and questioned defendant whether he had marijuana on him or in car), *aff'd in part*, 361 F. App'x 153 (D.C. Cir. 2009).

I do find though that the encounter became custodial when Muller arrived on scene and informed Wofford that he was being detained and was not free to leave. (G. Ex. 40 Grillo Footage Video 2 at 17:39:49 – 17:40:06). Muller's conduct and demeanor during his interaction with Wofford changed the nature and circumstances of the stop. By the time he arrived, Grillo and Cumberbatch were standing by the front doors of the Traverse – effectively blocking Wofford's exit, and Grillo had asked Wofford to put the car in park. (*Id.* at 17:37:34 – 17:37:42). Shortly after approaching the vehicle, Muller repeatedly ordered Wofford from the vehicle, drew his baton, and threatened to break one of the vehicle's windows. (*Id.* at 17:38:46 – 17:39:35). He confronted Wofford about the smell of marijuana and informed Wofford that he knew Wofford "sell[s]" and that he had been "watching" him. (*Id.*). He also told Wofford that the situation was not going to just go away, that he knew that Wofford had marijuana in the vehicle, that he knew what Wofford had been doing, and that he was not going to just leave Wofford there. (*Id.* at 17:39:08 – 17:43:06). Although other considerations, including the facts that the encounter occurred on a public street, the vehicle remained running for a portion of the stop, and Wofford was able to use his cellphone, weigh against a finding of custody, the totality of the circumstances supports the conclusion that Wofford was in custody when Muller informed him that he was not free to leave the encounter. *See United States v. Mack*, 2014 WL 7140604, *14 (D. Vt. 2014) (traffic stop transitioned to custodial detention upon arrival of trooper who informed occupants that they were not free to leave, confronted defendant in an accusatory tone, and informed him that he had been under surveillance); *United States v. Spencer*, 2014 WL 2521008, *11 (W.D.N.Y.) (target of surveillance was in custody when his vehicle was stopped

and surrounded by police vehicles and he was ordered to place the vehicle in park, turn off the

ignition, and relinquish the keys), *report and recommendation adopted by*, 2014 WL 2945617

(W.D.N.Y. 2014), *aff'd*, 646 F. App'x 6 (2d Cir. 2016).

Muller continued his attempts to convince Wofford to leave the vehicle for

approximately ten minutes after telling Wofford that he was not free to leave.  (G. Ex. 40 Grillo

Footage Video 2 at 17:39:49 – 17:49:25).  During that time, Muller repeatedly confronted

Wofford about the smell of marijuana coming from the vehicle, made references to other

criminal activity, asked him what he had to "hide," or made other statements or comments that

could be viewed as interrogation or its functional equivalent.  (*See*, *e.g.*, G. Ex. 40 Grillo Footage

Video 2 at 17:41:56, 17:43:35, 17:44:54, 17:46:03, 17:48:16 – 17:48:36).

Muller ceased his efforts to convince Wofford to exit once Perrone and

Montinarelli arrived at the scene.  (G. Ex. 40 Grillo Footage Video 2 at 17:49:28).  Although

Perrone and Montinarelli both told Wofford that they smelled marijuana, they appear to have

done so only in response to Wofford's demands to know the basis for the stop and their orders

that he exit the vehicle.  (G. Ex. 40 Grillo Footage Videos 2 and 3 at 17:49:28 – 17:57:21; G. Ex.

40 Cumberbatch Footage Video 1 at 17:53:43 - 17:54:44; G. Ex. 40 Seng Footage Video 3 at

17:49:42 – 17:57:16).  These statements, in my estimation, do not constitute interrogation or its

equivalent.

Although it appears that the primary goal of the officers' verbal interactions with

Wofford may have been to convince him to get out of the Traverse, assuming that he was in

custody once he was told that he was not free to leave, many statements made by Muller during

the following ten-minute exchange may nonetheless constitute interrogation or its functional

equivalent.  Given the length of this interaction and the possibility that some of Wofford's

statements could have been elicited in response to statements that may meet the definition of interrogation, the government must identify the precise statements it seeks to use so that the Court may determine whether they were elicited in response to interrogation by the officers – a determination which may require a further evidentiary hearing.

Accordingly, to the extent that the government may seek to introduce any statements made by Wofford while he was inside the Traverse between approximately 5:40 and 5:50 p.m., the government must file a supplemental submission on or before **January 25, 2021**, identifying those statements and the basis for its contention that they were not elicited in response to interrogation; the defense may file a responsive submission by **February 8, 2021**. If the government fails to identify any statements by that date, the Court recommends that the district court deny Wofford's motion to the extent he seeks to suppress statements made in his vehicle on February 20, 2018, prior to 5:40 p.m. and after 5:50 p.m. (but not any statements he made after exiting the vehicle)[12] and grant the motion to suppress any statements he made between that time.

**B.    July 25, 2018 Statements**

Having reviewed the testimony and video footage of the July 25, 2018 traffic stop, I agree with the government that Wofford was not subjected to custodial interrogation prior to exiting the Traverse. (Docket # 73 at 24). The encounter between the initial stop and the handcuffing of Wofford was very brief, lasting less than two minutes. Seng approached the Traverse, asked Wofford for his license and registration, repeatedly ordered him from the vehicle, and informed him that there was a warrant for his arrest. (G. Ex. 41 Seng Footage Video 1 at 18:12:55 – 18:13:49). During this brief interaction, Seng did not interrogate Wofford, nor

---

[12] *See supra* FN 11.

did he engage in conduct likely to illicit an incriminating response. Further, despite Wofford's conclusory assertions to the contrary, nothing in the record suggests to this Court that his statements were involuntary.

Accordingly, I recommend that the district court deny Wofford's motion to suppress the statements he made inside the Traverse on July 25, 2018.

## CONCLUSION

For for the reasons stated above, I recommend that the district court deny Wofford's motion to suppress tangible evidence (**Docket ## 37, 69, 70**). I further recommend that the district court grant Wofford's motion to suppress statements he made after exiting the Traverse on February 20 and July 25, 2018 and, unless the government files a further submission on or before **January 25, 2021**, grant Wofford's motion to suppress statements he made on February 20, 2018, between 5:40 p.m. and 5:50 p.m. Finally, I recommend that the district court deny Wofford's motion to suppress statements he made while in the Traverse on February 20, 2018 prior to 5:40 p.m. and after 5:50 p.m., and any statements he made in the Traverse on July 25, 2018.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
January 11, 2021

54

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[13]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                   *s/Marian W. Payson*
                                     MARIAN W. PAYSON
                             United States Magistrate Judge

Dated: Rochester, New York
       January 11, 2021

---

[13] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).